

# ENVIRONMENTAL LAW & POLICY CENTER
### Protecting the Midwest's Environment and Natural Heritage

February 26, 2020

Mr. Jeffrey Bossert Clark
Assistant Attorney General
U.S. DOJ—ENRD
P.O. Box 7611
Washington, D.C. 20044-7611

Submitted electronically to pubcomment-ees.enrd@usdoj.gov

Re:     Proposed Consent Decree: *United States v. Gulfport Energy Corporation, Case No. 2:20–cv–00340–ALM–CMV*; United States District Court for the Southern District of Ohio

To the Assistant Attorney General:

Pursuant to 28 C.F.R. § 50.7, the Environmental Law & Policy Center ("ELPC"), Concerned Barnesville Area Residents, and FracTracker Alliance respectfully submit these comments on the Proposed Consent Decree lodged by the United States Department of Justice ("DOJ") in *United States v. Gulfport Energy Corporation*, Case No. 2:20–cv–00340–ALM–CMV, with the United States District Court for the Southern District of Ohio on January 22, 2020.

ELPC is the Midwest's leading public interest environmental legal advocacy organization and works to protect the environment and public health. Concerned Barnesville Area Residents is a local organization focused on addressing the environmental risks posed by shale gas development and hydraulic fracturing to the Barnesville community and Appalachian Ohio. FracTracker Alliance studies, maps, and communicates the risks of oil and gas development to protect our planet and support the renewable energy transformation.

## COMMENTS

Gulfport Energy Corporation ("Gulfport") is a natural gas and oil company that has failed to be a good neighbor to the people of southeastern Ohio. EPA claims that, at a dozen of its well pads across three counties, Gulfport engaged in "widespread and repeated" violations of the Clean Air Act by unilaterally deciding that certain Clean Air Act requirements for its storage vessels did not apply.[1] EPA claims that Gulfport's violations resulted in emissions of volatile organic compounds ("VOCs"), which are a component of ground-level ozone.[2] Ground-level ozone makes breathing more difficult, aggravates lung diseases such as asthma, and puts

---

[1] Complaint at ¶ 4, *see also* ¶ 50.
[2] *Id*. at ¶ 31.

Draft
Confidential Work Product

children, older adults, and outdoor workers at risk of respiratory problems.[3] According to EPA, "[c]hildren are at greatest risk from exposure to ozone because their lungs are still developing and they are more likely to be active outdoors when ozone levels are high."[4]

Before approving a consent decree, the Court must first determine whether the decree is "fair, reasonable, adequate, and consistent with applicable law."[5] The role of the Court in reviewing the Proposed Consent Decree is not to give "rubberstamp approval."[6] Rather, judicial review ensures that the decree protects the public interest.[7] Courts do not approve consent decrees that are "contrary to the public good" or "inequitable."[8] Consent Decrees are substantively unfair when their requirements fail to deter future violations and fail to promote accountability.[9] Under the Sixth Circuit's review of consent decrees, it also considers whether the consent decree is "arbitrary and capricious."[10]

The Proposed Consent Decree does not sufficiently protect the public interest because it fails to ensure that Gulfport will maintain future compliance with the Clean Air Act. Our comments focus on two inadequacies of the Proposed Consent Decree: (1) the lack of community involvement in the consent decree formation process and (2) the absence of online reporting requirements. The online reporting should be housed on a website maintained by Gulfport and containing Gulfport's quarterly and semi-annual compliance reports required by the Clean Air Act and the Proposed Consent Decree.

## I. The Proposed Consent Decree and Enforcement Process Failed to Incorporate Community Stakeholder Input and, Therefore, Does Not Protect the Public Interest.

The communities near Gulfport's well pads should have been treated as a stakeholder and provided a voice in the enforcement action against Gulfport. The existence and identity of individuals with specific concerns about the enforcement case against Gulfport were in the public domain due to news articles published about community concerns with Gulfport.[11] No party to the Proposed Consent Decree affirmatively reached out to those individuals as part of

---

[3] U.S. EPA, *Health Effects of Ozone Pollution*, https://www.epa.gov/ground-level-ozone-pollution/health-effects-ozone-pollution, *archived at* https://perma.cc/UE6J-VRK8
[4] *Id.*
[5] *United States v. BP Exploration & Oil Co.*, 167 F. Supp. 2d 1045, 1049 (N.D. Ind. 2001); *see also United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991)
[6] *BP Exploration & Oil Co.*, 167 F. Supp. 2d at 1050.
[7] *Id.* at 1049; *see also United States v. Metro. Water Reclamation Dist. of Greater Chicago*, 2014 WL 64655, at *9 (N.D. Ill. Jan. 6, 2014) (to determine whether a consent decree is reasonable, "the Court will consider whether it is in the public's best interest"), *aff'd*, 792 F.3d 821 (7th Cir. 2015).
[8] *BP Exploration & Oil Co.*, 167 F. Supp. 2d at 1049.
[9] *United States v. BP Products North America Inc.*, Case No. 12-CV-207, 2012 WL 5411713 at *3 (N.D. Ind. Nov. 6, 2012) (stating that fairness requires consent decree terms to "prevent similar non-compliance" in the future and meet "standards of accountability").
[10] *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991) (applying both the "fairness, reasonableness and consistency with the statute" standard in addition to the "arbitrary and capricious" standard found in CERCLA's judicial review provision. 42 U.S.C. § 9613). The Clean Air Act contains a similar "arbitrary and capricious" standard in its judicial review provision. 42 U.S.C. 7607.
[11] *See, e.g.*, Corbin Hiar and Mike Soraghan, *Facing fines, polluters turn to Trump's enforcement fixer*, EENEWS.NET (Sept. 18, 2019), https://www.eenews.net/stories/1061135015; Corbin Hiar, *An Ohio family suffers as enforcement stalls*, EENEWS.NET (Oct. 3, 2019), https://www.eenews.net/greenwire/stories/1061195677.

Draft
Confidential Work Product

the enforcement matter against Gulfport.[12]

The lack of community involvement and outreach runs counter to EPA and DOJ guidance on incorporating communities into enforcement matters, thus rendering the Proposed Consent Decree not in the public interest. Gulfport's well pads are in the areas of environmental justice concern where low-income communities have been exposed to excess VOC emissions from Gulfport's storage vessels. The cumulative public health and environmental impacts of fracked gas production in the communities of much of Appalachian Ohio are shown by environmental justice indicators, such as proximity to potential chemical accidents and hazardous waste management facilities.[13]

Gulfport's violations are also concerning because the areas around the well pads experience high levels of ozone in the summer months. In the area around Barnesville, ozone exposure is in the 76th percentile in EPA's Region 5 and 67th percentile in the U.S.[14] In the area around Piedmont, ozone exposure is in the 83rd percentile in EPA's Region 5 and 71st percentile in the U.S.[15] VOC emissions, such as those from Gulfport's storage vessels, are a component of ground-level ozone.[16]

In its EJ 2020 Action Agenda, EPA committed to:

[E]nhance communication and transparency with affected communities and the public regarding compliance and enforcement actions, so that community input can inform our work, and communities can be empowered with information about environmental and human health stressors that affect them.[17]

Community input cannot "inform [EPA's] work" unless it actively tries to seek out such community input. Similarly, the Department of Justice ("DOJ") has committed to "[w]ork with communities so that enforcement actions and other programs, activities, and policies" respond to

---

[12] Affirmatively reaching out to communities would make them more comfortable speaking about the enforcement action. Due to some proposed legislation in Ohio, such as Senate Bill 33 and House Bill 362, some community members are afraid to reach out.

[13] *See* **Attachment A** and **Attachment B** (EJScreen Reports). **Attachment A** is a 5-mile radius around a cluster of Gulfport wells outside of Barnesville. **Attachment B** is a 5-mile radius around a cluster of Gulfport wells outside of Piedmont.

**Attachment A** shows that the area around Barnesville has an EJ Index for RMP Proximity (risk management plan for potential chemical accidents) in the 67th percentile for the state of Ohio and EJ Index for hazardous waste proximity in the 72nd percentile for the state of Ohio.

**Attachment B** shows that the area around Piedmont has an EJ Index for RMP Proximity in the 67th percentile for the state of Ohio and EJ Index for hazardous waste proximity in the 70th percentile for the state of Ohio.

[14] **Attachment A** at 3.

[15] **Attachment B** at 3.

[16] *See* fn. 3.

[17] U.S. ENVTL. PROT. AGENCY, EJ 2020 AGENDA at 11 (Oct. 2016), *available at* https://www.epa.gov/sites/production/files/2016-05/documents/052216_ej_2020_strategic_plan_final_0.pdf, *archived at* https://perma.cc/9V3T-ZZ88.

Draft
Confidential Work Product

environmental risks and community concerns.[18] DOJ's commitment to outreach cannot be accomplished without some attempt to involve the communities at issue in enforcement proceedings. As DOJ's 2017 Environmental Justice Implementation Progress Report notes, "Meaningful community engagement is a fundamental principle of environmental justice."[19]

Although there are very limited instances related solely to settlement negotiations that limit the government's ability to publicly provide information on the enforcement process, we do not know of any policy that forbids EPA or DOJ from talking about its own enforcement positions with members of the public affected by an enforcement action or from soliciting information and input from communities on ongoing enforcement matters.[20] If the neighboring communities had been adequately consulted, the parties to the Proposed Consent Decree they would have learned: (1) there needs to be online reporting and sharing of the data about emissions that does not require a FOIA request; (2) there needs to be a clear timeline for compliance with the settlement; (3) that residents wants access to tools to conduct emissions testing near their homes. Even if not all this relief could be obtained, communication with the communities would at least foster trust between the parties and the communities.

The residents of Barnesville have been especially concerned about Gulfport's emissions. Some well pads are situated near sensitive areas, such as the Boy Scout well pad near a campsite for young Boy Scouts. Some residents have chosen to leave their homes because of the growing air pollution from Gulfport's operations and other natural gas operations in the area stemming from Central Appalachia being promoted as a petrochemical and/or natural gas storage hub. Simply re-establishing the controls Gulfport should have had in place may not sufficiently address the harms faced by the nearby communities, and the community of Barnesville would have provided input on these measures had they been consulted.

EPA's guidance on Supplemental Environmental Projects ("SEPs") states that "EPA should encourage input on project proposals from the local community that may have been adversely impacted by the violations."[21] As EPA has noted:

Soliciting community input during the SEP development process can: result in SEPs that better address the needs of the impacted community; promote environmental justice; produce better community understanding of EPA enforcement; and improve relations between the community and the violating facility.[22]

There is no SEP in the Proposed Consent Decree, and there did not appear to be any

---

[18] U.S. DEPT. OF JUSTICE, ENVIRONMENTAL JUSTICE STRATEGY at 2 (Dec. 18, 2014), *available at* https://www.justice.gov/sites/default/files/ej/pages/attachments/2014/12/19/doj_ej_strategy.pdf, *archived at* https://perma.cc/E6ZS-5RNY.
[19] U.S. DEPT. OF JUSTICE, FY 2017 ENVIRONMENTAL JUSTICE IMPLEMENTATION PROGRESS REPORT at 4 (May 31, 2017), *available at* https://www.justice.gov/file/1059841/download, *archived at* https://perma.cc/7VKA-9F5F.
[20] While there are privileges to withhold communication and documents in the Freedom of Information Act context for enforcement matters, those can be waived and are not affirmative prohibitions.
[21] U.S. ENVTL. PROT. AGENCY, SUPPLEMENTAL ENVIRONMENTAL PROJECTS POLICY 2015 UPDATE 18 (Mar. 10, 2015).
[22] *Id.*

Draft
Confidential Work Product

attempt to seek community input on potential SEPs. Whether such outreach would ultimately
turn into SEP projects that meet SEP policies is beside the point because there are still positive
benefits gained from increasing transparency in the enforcement process and promoting trust
with affected communities.

## II.    The Proposed Consent Decree Lacks the Transparency Offered by Online
Reporting Necessary to Ensure Gulfport's Future Compliance, Promote
Accountability, and Protect the Public Interest.

The Proposed Consent Decree should require Gulfport to post all of its compliance
reports online on a dedicated website hosted by Gulfport that contains all of Gulfport's quarterly
and semi-annual compliance reports required by the Clean Air Act and the Proposed Consent
Decree. In its EJ 2020 Action Agenda EPA committed to "increase the number of EPA
enforcement settlements negotiated each year that incorporate environmental monitors and/or
transparency tools (*e.g.*, web posting of data)."[23]

There is precedent for online reporting in other consent decrees. For example, the
recently proposed Consent Decree between EPA and U.S. Steel provides for online water quality
compliance reporting on a website hosted by U.S. Steel.[24] The BP Whiting Refinery consent
decree also contained requirements to publicly post online the results of fenceline monitoring.[25]
Outside of the consent decree context, other EPA programs, such as the coal ash regulatory

---

[23] U.S. ENVTL. PROT. AGENCY, EJ 2020 AGENDA at 19, 21 (Oct. 2016), *available at*
https://www.epa.gov/sites/production/files/2016-05/documents/052216_ej_2020_strategic_plan_final_0.pdf,
*archived at* https://perma.cc/9V3T-ZZ88.

[24] *United States v. U.S. Steel Corp.*, Case No. 18-CV-127 (N.D. Ind.), Revised Consent Decree at ¶ 17.a (filed Nov.
11, 2019), which reads:

> U. S. Steel shall submit to IDEM weekly reports from May 1 through September 30 and monthly reports
> from October 30 through April 30. Weekly reports shall be submitted no later than Wednesday and shall
> cover the sampling performed the previous week. Monthly reports shall be submitted on the 5th business
> day of each month and shall cover the sampling performed the previous month. Concurrently with each
> submission to IDEM, U. S. Steel shall make the reports publicly available at the following website:
> www.midwest.uss.com. Each report shall include the dates and times of sampling events and the results of
> the measurements for all parameters listed above. In addition, U. S. Steel shall submit an annual project
> report to IDEM by March 31 of each year and make the annual report publicly available at the website
> above.

[25] *BP Products North America,* Case No. 12-CV-207, Consent Decree appendix E at 4 (entered Nov. 6, 2012),
which reads:

> On a weekly basis, BPP shall post the Fence Line Monitoring System data on a dedicated website or
> through BPP Whiting's internet homepage ("Monitoring Data Website"), in a manner that shall be readily
> accessible, clearly labeled, and clearly presented to the public. BPP shall additionally post on the
> Monitoring Data Website, on a quarterly basis, CEMS emissions reports submitted to IDEM and/or
> USEPA pursuant to the Title V permit for all refinery units that are monitored by CEMS. BPP shall
> maintain data collected through the Fence Line Monitoring System on the Monitoring Data Website for at
> least five years from the date of its collection, and shall review the Fence Line Monitoring Data with the
> CAC members as they may request.

Draft
Confidential Work Product

regime, require posting of compliance reports on a website hosted by regulated entities.[26]

Requiring online reporting will promote the accountability that consent decrees require by making Gulfport accountable not just to EPA but also to the surrounding communities. Online reporting can "ensure compliance with the settlement" by providing the surrounding community with information that impacts their lives in a timely and accessible format.[27] While the information contained in Gulfport's compliance reports is considered public, the Freedom of Information Act ("FOIA") process is an impediment to communities near Gulfport's facilities who often lack expertise or resources necessary to navigate the FOIA process. Requiring Gulfport to publish its compliance reports online will promote greater access to this information and reduces the burden on EPA to respond to FOIA requests.[28]

EPA's Office of Enforcement and Compliance Assurance has seen steady losses in full-time employees over the years,[29] and requiring online reporting will allow the surrounding communities to raise additional and less anecdotal compliance concerns with EPA. Online reporting will complement EPA's compliance monitoring by helping find deviations sooner than without online reporting. Online reporting is especially necessary because of Gulfport's history of reporting failures and its proximity to communities interested in its compliance status.

## CONCLUSION

To protect the surrounding communities and ensure future compliance with the Proposed Consent Decree and the Clean Air Act, the Consent Decree should require additional injunctive relief in the form of online reporting of quarterly and semi-annual compliance reports required by the Clean Air Act and the Proposed Consent Decree. Furthermore, the parties should go back and involve the community by soliciting their input on the settlement, including relief that they would like to see incorporated. These changes to the Consent Decree will deter the facility from future noncompliance and make it accountable to the communities.

Gulfport and EPA should also reconsider not including a SEP. For example, EPA could leverage its Region 5 environmental justice programs' resources to host a workshop or community town hall to solicit input by the community surrounding the well pads. EPA could also reach out to Ohio EPA's environmental justice coordinator to set up a similar event. Publicity for the event could include traditional notices in the local newspaper and paid social media advertisements targeted at this community. An additional avenue could be to provide the information to the schools in the immediate vicinity.

---

[26] See 40 C.F.R. § 257.107.

[27] U.S. ENVTL. PROT. AGENCY, GUIDANCE ON STREAMLINING OVERSIGHT IN CIVIL SETTLEMENTS at 11 (Jan. 10, 2013) (online posting "may be particularly attractive to communities with environmental justice concerns because these communities often feel they do not have access to relevant information").

[28] Id. ("[H]aving information available to the public reduces the burden on EPA responding to multiple information requests.").

[29] See, e.g., ENVIRONMENTAL INTEGRITY PROJECT, Less Enforcement: Communities at Risk 6 (Feb. 26, 2019), https://www.environmentalintegrity.org/wp-content/uploads/2019/02/EIP-Enforcement-Report.pdf (showing that civil enforcement and compliance monitoring staff levels have dropped from 2,189 full-time employees in year 2006 to only 1,842 full-time employees in year 2018), archived at https://perma.cc/N7Z8-6LZ5.

Draft
Confidential Work Product

    Thank you for considering our comments.


                                    Respectfully submitted,

                                    /s/ Jeffrey Hammons
                                    Kiana Courtney
                                    Jeffrey Hammons
                                    Environmental Law and Policy Center
                                    35 East Wacker Drive, Suite 1600
                                    Chicago, Illinois 60601
                                    (785) 217-5722 (Jeffrey)
                                    (312) 795-3712 (Kiana)
                                    JHammons@elpc.org
                                    KCourtney@elpc.org

                                    /s/ Jill Hunkler
                                    Jill Hunkler
                                    Concerned Barnesville Area Residents
                                    P.O. Box 425
                                    Barnesville, Ohio 43713
                                    jahhunkler@gmail.com

                                    /s/ Ted Auch
                                    Dr. Ted Auch
                                    FracTracker Alliance
                                    3558 Lee Road
                                    Shaker Heights, Ohio 44120
                                    auch@fractracker.org


CC (via email):
Randall Stone (ENRD), Randall.Stone@usdoj.gov
Robert Peachey (EPA), Peachey.Robert@epa.gov
Natalie Topinka (EPA), Topinka.Natalie@epa.gov
Constantinos Loukeris (EPA), Loukeris.Constantinos@epa.gov

**Attachment A – EJ Screen Report**
**5-mile Ring Radius outside of Barnesville, Ohio**

 **EPA** United States Environmental Protection Agency

# EJSCREEN Report (Version 2019)



## 5 miles Ring Centered at 40.024240,-81.111701, OHIO, EPA Region 5

### Approximate Population: 9,407
### Input Area (sq. miles): 78.53

| Selected Variables | State Percentile | EPA Region Percentile | USA Percentile |
|---|---|---|---|
| **EJ Indexes** | | | |
| EJ Index for PM2.5 | 47 | 42 | 30 |
| EJ Index for Ozone | 45 | 40 | 29 |
| EJ Index for NATA* Diesel PM | 62 | 56 | 42 |
| EJ Index for NATA* Air Toxics Cancer Risk | 44 | 41 | 34 |
| EJ Index for NATA* Respiratory Hazard Index | 48 | 43 | 37 |
| EJ Index for Traffic Proximity and Volume | 44 | 45 | 36 |
| EJ Index for Lead Paint Indicator | 30 | 24 | 14 |
| EJ Index for Superfund Proximity | 43 | 45 | 33 |
| EJ Index for RMP Proximity | 67 | 64 | 47 |
| EJ Index for Hazardous Waste Proximity | 72 | 67 | 51 |
| EJ Index for Wastewater Discharge Indicator | 23 | 19 | 11 |



This report shows the values for environmental and demographic indicators and EJSCREEN indexes. It shows environmental and demographic raw data (e.g., the estimated concentration of ozone in the air), and also shows what percentile each raw data value represents. These percentiles provide perspective on how the selected block group or buffer area compares to the entire state, EPA region, or nation. For example, if a given location is at the 95th percentile nationwide, this means that only 5 percent of the US population has a higher block group value than the average person in the location being analyzed. The years for which the data are available, and the methods used, vary across these indicators. Important caveats and uncertainties apply to this screening-level information, so it is essential to understand the limitations on appropriate interpretations and applications of these indicators. Please see EJSCREEN documentation for discussion of these issues before using reports.

 **EPA** United States Environmental Protection Agency

**EJSCREEN Report (Version 2019)** 

5 miles Ring Centered at 40.024240,-81.111701, OHIO, EPA Region 5

**Approximate Population: 9,407**
**Input Area (sq. miles): 78.53**



| Sites reporting to EPA | |
|---|---|
| Superfund NPL | 0 |
| Hazardous Waste Treatment, Storage, and Disposal Facilities (TSDF) | 0 |





# EJSCREEN Report (Version 2019)

**5 miles Ring Centered at 40.024240,-81.111701, OHIO, EPA Region 5**

**Approximate Population: 9,407**

**Input Area (sq. miles): 78.53**

| Selected Variables | Value | State Avg. | %ile in State | EPA Region Avg. | %ile in EPA Region | USA Avg. | %ile in USA |
|---|---|---|---|---|---|---|---|
| **Environmental Indicators** | | | | | | | |
| Particulate Matter (PM 2.5 in µg/m$^3$) | 8.39 | 9.09 | 6 | 8.63 | 27 | 8.3 | 51 |
| Ozone (ppb) | 45.4 | 46 | 38 | 43.4 | 76 | 43 | 67 |
| NATA* Diesel PM (µg/m$^3$) | 0.156 | 0.416 | 1 | 0.446 | <50th | 0.479 | <50th |
| NATA* Cancer Risk (lifetime risk per million) | 25 | 26 | 44 | 26 | <50th | 32 | <50th |
| NATA* Respiratory Hazard Index | 0.29 | 0.34 | 20 | 0.34 | <50th | 0.44 | <50th |
| Traffic Proximity and Volume (daily traffic count/distance to road) | 41 | 400 | 28 | 530 | 24 | 750 | 22 |
| Lead Paint Indicator (% Pre-1960 Housing) | 0.46 | 0.41 | 62 | 0.38 | 64 | 0.28 | 74 |
| Superfund Proximity (site count/km distance) | 0.042 | 0.095 | 45 | 0.13 | 35 | 0.13 | 36 |
| RMP Proximity (facility count/km distance) | 0.075 | 0.7 | 4 | 0.82 | 6 | 0.74 | 9 |
| Hazardous Waste Proximity (facility count/km distance) | 0.034 | 1.6 | 0 | 1.5 | 2 | 4 | 4 |
| Wastewater Discharge Indicator (toxicity-weighted concentration/m distance) | 0.011 | 0.23 | 72 | 0.82 | 73 | 14 | 79 |
| **Demographic Indicators** | | | | | | | |
| Demographic Index | 19% | 26% | 47 | 28% | 44 | 36% | 28 |
| Minority Population | 3% | 20% | 18 | 25% | 13 | 39% | 6 |
| Low Income Population | 36% | 33% | 61 | 31% | 64 | 33% | 59 |
| Linguistically Isolated Population | 0% | 1% | 68 | 2% | 58 | 4% | 45 |
| Population With Less Than High School Education | 7% | 10% | 46 | 10% | 48 | 13% | 40 |
| Population Under 5 years of age | 6% | 6% | 59 | 6% | 58 | 6% | 55 |
| Population over 64 years of age | 18% | 16% | 65 | 15% | 69 | 15% | 71 |

* The National-Scale Air Toxics Assessment (NATA) is EPA's ongoing, comprehensive evaluation of air toxics in the United States. EPA developed the NATA to prioritize air toxics, emission sources, and locations of interest for further study. It is important to remember that NATA provides broad estimates of health risks over geographic areas of the country, not definitive risks to specific individuals or locations. More information on the NATA analysis can be found at: https://www.epa.gov/national-air-toxics-assessment.

For additional information, see: www.epa.gov/environmentaljustice

EJSCREEN is a screening tool for pre-decisional use only. It can help identify areas that may warrant additional consideration, analysis, or outreach. It does not provide a basis for decision-making, but it may help identify potential areas of EJ concern. Users should keep in mind that screening tools are subject to substantial uncertainty in their demographic and environmental data, particularly when looking at small geographic areas. Important caveats and uncertainties apply to this screening-level information, so it is essential to understand the limitations on appropriate interpretations and applications of these indicators. Please see EJSCREEN documentation for discussion of these issues before using reports. This screening tool does not provide data on every environmental impact and demographic factor that may be relevant to a particular location. EJSCREEN outputs should be supplemented with additional information and local knowledge before taking any action to address potential EJ concerns.

**Attachment B – EJ Screen Report**
**5-mile Ring Radius outside of Piedmont, Ohio**

 

# EJSCREEN Report (Version 2019)

## 5 miles Ring Centered at 40.190720,-81.213325, OHIO, EPA Region 5

**Approximate Population: 2,076**

**Input Area (sq. miles): 78.53**

| Selected Variables | State Percentile | EPA Region Percentile | USA Percentile |
|---|---|---|---|
| **EJ Indexes** | | | |
| EJ Index for PM2.5 | 50 | 44 | 32 |
| EJ Index for Ozone | 49 | 43 | 32 |
| EJ Index for NATA* Diesel PM | 65 | 59 | 45 |
| EJ Index for NATA* Air Toxics Cancer Risk | 51 | 46 | 38 |
| EJ Index for NATA* Respiratory Hazard Index | 52 | 47 | 40 |
| EJ Index for Traffic Proximity and Volume | 51 | 51 | 40 |
| EJ Index for Lead Paint Indicator | 33 | 27 | 15 |
| EJ Index for Superfund Proximity | 49 | 50 | 37 |
| EJ Index for RMP Proximity | 67 | 63 | 46 |
| EJ Index for Hazardous Waste Proximity | 70 | 64 | 49 |
| EJ Index for Wastewater Discharge Indicator | 61 | 44 | 29 |



This report shows the values for environmental and demographic indicators and EJSCREEN indexes. It shows environmental and demographic raw data (e.g., the estimated concentration of ozone in the air), and also shows what percentile each raw data value represents. These percentiles provide perspective on how the selected block group or buffer area compares to the entire state, EPA region, or nation. For example, if a given location is at the 95th percentile nationwide, this means that only 5 percent of the US population has a higher block group value than the average person in the location being analyzed. The years for which the data are available, and the methods used, vary across these indicators. Important caveats and uncertainties apply to this screening-level information, so it is essential to understand the limitations on appropriate interpretations and applications of these indicators. Please see EJSCREEN documentation for discussion of these issues before using reports.

February 25, 2020

 **EJSCREEN Report (Version 2019)** 

5 miles Ring Centered at 40.190720,-81.213325, OHIO, EPA Region 5

Approximate Population: 2,076
Input Area (sq. miles): 78.53



| Sites reporting to EPA | |
| --- | --- |
| Superfund NPL | 0 |
| Hazardous Waste Treatment, Storage, and Disposal Facilities (TSDF) | 0 |



**EJSCREEN Report (Version 2019)**



**5 miles Ring Centered at 40.190720,-81.213325, OHIO, EPA Region 5**

**Approximate Population: 2,076**

**Input Area (sq. miles): 78.53**

| Selected Variables | Value | State Avg. | %ile in State | EPA Region Avg. | %ile in EPA Region | USA Avg. | %ile in USA |
|---|---|---|---|---|---|---|---|
| **Environmental Indicators** | | | | | | | |
| Particulate Matter (PM 2.5 in $\mu g/m^3$) | 8.59 | 9.09 | 16 | 8.63 | 35 | 8.3 | 58 |
| Ozone (ppb) | 45.9 | 46 | 46 | 43.4 | 83 | 43 | 71 |
| NATA* Diesel PM ($\mu g/m^3$) | 0.149 | 0.416 | 0 | 0.446 | <50th | 0.479 | <50th |
| NATA* Cancer Risk (lifetime risk per million) | 23 | 26 | 23 | 26 | <50th | 32 | <50th |
| NATA* Respiratory Hazard Index | 0.28 | 0.34 | 15 | 0.34 | <50th | 0.44 | <50th |
| Traffic Proximity and Volume (daily traffic count/distance to road) | 26 | 400 | 22 | 530 | 19 | 750 | 17 |
| Lead Paint Indicator (% Pre-1960 Housing) | 0.49 | 0.41 | 65 | 0.38 | 66 | 0.28 | 76 |
| Superfund Proximity (site count/km distance) | 0.035 | 0.095 | 40 | 0.13 | 27 | 0.13 | 31 |
| RMP Proximity (facility count/km distance) | 0.1 | 0.7 | 10 | 0.82 | 11 | 0.74 | 16 |
| Hazardous Waste Proximity (facility count/km distance) | 0.055 | 1.6 | 2 | 1.5 | 7 | 4 | 8 |
| Wastewater Discharge Indicator (toxicity-weighted concentration/m distance) | 0.0001 | 0.23 | 28 | 0.82 | 44 | 14 | 54 |
| **Demographic Indicators** | | | | | | | |
| Demographic Index | 19% | 26% | 46 | 28% | 44 | 36% | 28 |
| Minority Population | 5% | 20% | 30 | 25% | 22 | 39% | 11 |
| Low Income Population | 33% | 33% | 57 | 31% | 60 | 33% | 56 |
| Linguistically Isolated Population | 0% | 1% | 68 | 2% | 59 | 4% | 45 |
| Population With Less Than High School Education | 16% | 10% | 79 | 10% | 80 | 13% | 70 |
| Population Under 5 years of age | 5% | 6% | 38 | 6% | 36 | 6% | 36 |
| Population over 64 years of age | 17% | 16% | 61 | 15% | 64 | 15% | 67 |

* The National-Scale Air Toxics Assessment (NATA) is EPA's ongoing, comprehensive evaluation of air toxics in the United States. EPA developed the NATA to prioritize air toxics, emission sources, and locations of interest for further study. It is important to remember that NATA provides broad estimates of health risks over geographic areas of the country, not definitive risks to specific individuals or locations. More information on the NATA analysis can be found at: https://www.epa.gov/national-air-toxics-assessment.

For additional information, see: www.epa.gov/environmentaljustice

EJSCREEN is a screening tool for pre-decisional use only. It can help identify areas that may warrant additional consideration, analysis, or outreach. It does not provide a basis for decision-making, but it may help identify potential areas of EJ concern. Users should keep in mind that screening tools are subject to substantial uncertainty in their demographic and environmental data, particularly when looking at small geographic areas. Important caveats and uncertainties apply to this screening-level information, so it is essential to understand the limitations on appropriate interpretations and applications of these indicators. Please see EJSCREEN documentation for discussion of these issues before using reports. This screening tool does not provide data on every environmental impact and demographic factor that may be relevant to a particular location. EJSCREEN outputs should be supplemented with additional information and local knowledge before taking any action to address potential EJ concerns.